IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LATONYA FRANKLIN,

    *Plaintiff,*

v.

TRI-COUNTY COUNCIL FOR THE
LOWER EASTERN SHORE OF
MARYLAND,

    *Defendant.*

Civil Action No.: ELH-15-00786

## MEMORANDUM OPINION

On March 18, 2015, Latonya Franklin, who is self-represented, filed suit in this Court against her former employer, Tri-County Council for the Lower Eastern Shore of Maryland ("TCC").[1] ECF 1, Complaint. Franklin, who began working for TCC in 2006, alleged that TCC terminated her in 2014 because of her color, and in retaliation for some undefined activity, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, *et seq. Id.* at 2.

On May 7, 2015, TCC filed a Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF 6, "First Motion"), accompanied by a memorandum of law (ECF 6-1) and six exhibits. ECF 6-3 through ECF 6-7. Franklin opposed the First Motion (ECF 8, "First Opposition"), and submitted twelve exhibits (ECF 8-1 through ECF 8-12) to support her

---

[1] The parties did not describe TCC. But, it appears that TCC "was formed by an Act of the Maryland General Assembly in 2001. The purpose of the Council is to facilitate regional planning and development in Somerset, Wicomico and Worcester counties." *About the Tri-County Council*, Tri-County Council for the Lower Eastern Shore of Maryland (Jan. 25, 2016 11:00 AM), http://www.lowershore.org/AboutUs.aspx.

position.  By Memorandum (ECF 9) and Order (ECF 10) of June 5, 2015, I granted TCC's First Motion, with leave to amend the Complaint.

Franklin's First Amended Complaint was docketed on June 26, 2015.  ECF 11.  It contains claims under Title VII for "Wrongful Termination" (*id.* ¶¶ 15-18); "Retaliation" (*id.* ¶¶ 5-10); and "Harassment" (*id.* ¶¶ 15-18), which I construe as a hostile work environment claim.[2] The First Amended Complaint also contains a claim for "Intentional Infliction of Emotional Distress" ("IIED") under Maryland law.  *Id.* ¶¶ 19-22.  Franklin seeks unspecified money damages (*id.* at 5) as well as "future attorney[s'] fees" and court costs.  *Id.* at 6.

TCC again moved to dismiss or, in the alternative, for summary judgment (ECF 12), accompanied by a memorandum of law.  ECF 12-1, "Memo" (collectively, "Motion").  The Motion is supported by six exhibits.  ECF 12-2 through ECF 12-5.[3]  Franklin opposes the Motion (ECF 14, "Opposition"), and TCC has replied.  ECF 15, "Reply."

The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion, in part, and deny it, in part.

---

[2] Because plaintiff is self-represented, her submissions must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In relation to her "Harassment" claim, plaintiff references her "right to work in and [sic] environment free from intimidation and harassment." ECF 11 ¶ 18, First Amended Complaint.  Therefore, I disagree with TCC's contention that "Plaintiff's Opposition [(ECF 14)] contains a new allegation for hostile work environment" and thus seeks to amend the First Amended Complaint in violation of Fed. R. Civ. P. 15(a)(2).  ECF 15 at 4, Reply.

[3] Exhibits D and E are audio recordings on compact disks.

# I.  Factual Background[4]

Plaintiff "is a Black female in her fifties."  ECF 8 at 10, First Opposition.  She began

work at TCC on September 6, 2006.  ECF 8-1 at 1; *see* ECF 11 ¶ 4, First Amended Complaint.

TCC terminated Franklin on February 24, 2014.  ECF 11 ¶ 4.  At the time, plaintiff was working

as an Operations Coordinator in the Lower Shore Workforce Alliance department.  ECF 8-1 at 1;

*see* ECF 11 ¶ 4.  Plaintiff asserts: "During the Plaintiff[']s tenure, she held many key positions

and placed [sic] in many roles with great responsibility.  The Plaintiff gained a high level of trust

from all levels of management."  ECF 8 at 2; ECF 11 ¶ 4 (alleging that Franklin "performed each

and every condition and covenant required . . .").

During plaintiff's employment, TCC issued a company cell phone to Franklin.  *See id.* at

4.  Franklin has submitted numerous excerpts from TCC's written policies and procedures

concerning company equipment.[5]  ECF 8-2 through ECF 8-11.  TCC policy states, in relevant

part, ECF 8-2 at 2: "All equipment provided to employees by Tri-County Council is restricted to

business use."  The policy also provides, *id*. at 4: "Employees are required to be professional and

conscientious at all times when using company equipment . . . . "  Further, TCC policy states, *id.*

_____

[4]  The First Amended Complaint is replete with conclusory assertions but devoid of factual allegations.  However, it begins, ECF 11 at 2: "On June 2, 2015, the Plaintiff submitted an Opposing Memorandum to this court and defendant[']s council [sic] . . . requesting the defendant[']s request for dismissal be denied. The Plaintiff provided this court with documents and provided allegations supporting the plaintiff's complaint on the basis of retaliation (post retaliation), wrongful termination, discrimination based on color, harassment and emotional distress."  Clearly, this is a reference to the exhibits that plaintiff submitted with her First Opposition.  *See* ECF 8-1 through ECF 8-12.  Construing plaintiff's submissions liberally, as I must, plaintiff has incorporated the First Opposition (ECF 8) and its accompanying exhibits (ECF 8-1 through ECF 8-12) into the First Amended Complaint.  *See Erickson*, 551 U.S. at 94. Accordingly, I also consider the factual allegations that Franklin advanced in those submissions.

[5]  TCC has also submitted copies of some of its policies.  *See* ECF 12-2; ECF 12-3; ECF 15-1.  The submissions duplicate, in part, Franklin's submissions.

at 5: "Cell phones are for business purposes only."  However, "incidental personal use of the business cell phone is tolerated."  ECF 8-3 at 1.  Franklin "acknowledges receiving revisions to the Defendant's policies during her employment with Tri-County Council."  ECF 8 at 4.

Franklin maintains that in December 2013 she heard a coworker, Rebecca Webster, refer to TCC's Workforce Director, Milton Morris, as "Buckwheat."  *Id.* at 5.  Franklin complained to TCC's Human Resources Director, Patricia Tiger.  *Id.*; *see* ECF 11 at 2.  According to plaintiff, ECF 8 at 5: "Ms. Tiger asked what the Plaintiff wanted to see done.  Ms. Tiger went on to say that Mrs. Webster hasn't received any complaints before and the Plaintiff responded by asking who would complain?"  It is unclear whether Franklin also alleges that Shannon Alexander, another coworker, used the word "Buckwheat" in reference to Morris.  But, Franklin alleges that Alexander "was told not to use the term again."  *Id.*

From Franklin's submissions, the precise events that gave rise to her termination are not clear.  It appears that during Franklin's employment with TCC, Franklin had a relationship with an unnamed "suitor."  *Id.* at 6.  Franklin alleges that her "suitor has a busy schedule with obligations in two counties here on the lower shore and began driving by the Tri-County Council building on Route 50 westbound around October 2013 without incident."  *Id.*  Franklin submits, *id.*: "Mrs. Alexander and Mrs. Webster transferred to the Lower Shore Workforce Alliance department on January 1, 2014."[6]  Franklin maintains that Alexander and Webster, who are "White," are friends.  *Id.* at 6, 7.

---

[6] From Franklin's submissions, it appears that Webster and/or Alexander referred to Morris as "Buckwheat" before Webster and Alexander began work in the Lower Shore Workforce Alliance department.

Franklin contends that after January 1, 2014, "Plaintiff's suitor caught the attention of four women who worked in the suite with the Plaintiff." *Id.* at 6. But, plaintiff never "introduced her suitor to any of the [TCC] employees," nor did she attend any TCC "functions" with her suitor. *Id.* Moreover, the suitor never visited plaintiff at work. *Id.*

At some point during January 2014, the two unnamed "Black women stopped making themselves available to be in the window when the Plaintiff's suitor would drive by." *Id.* at 6. But, Alexander and Webster "did not." *Id.* From Franklin's submissions, it is unclear what she alleges that the women did.

According to Franklin, she raised concerns with Tiger about the behavior of Alexander and Webster during January 2014 and suggested "that a No Contact Order might be necessary for Mrs. Alexander." *Id.* at 7. Franklin maintains that Tiger spoke with Webster and that Tiger asked Webster "to 'let her know if the Plaintiff said anything else'" concerning Franklin's proposed "No Contact Order." *Id.* Franklin contends that Tiger also spoke with Alexander and said "that she [(Tiger)] thought a No Contact Order was too harsh and the Plaintiff's male suitor can stop driving by to [sic]."[7] *Id.* Franklin asserts: "Ms. Tiger acknowledged on Thursday, February 20, 2014 to coworkers that she was aware of Mrs. Alexander's promiscuous behavior when she communicated to Mrs. [Sherry] Taylor[8] [(a Human Resources Specialist)] and Kim Dryden [(another TCC employee)] that the Plaintiff is handling it well because she knows he

---

[7] It appears that Franklin alleges that Tiger made a substantially identical comment to Webster. *See* ECF 8 at 6.

[8] Franklin identifies "Sherrie Taylor" as a "Human Resources Specialist." ECF 8 at 2. Tiger's letter to Franklin, dated February 24, 2014, directs Franklin to contact "Sherry Taylor" for questions concerning retirement savings. ECF 8-12 at 1. In her First Amended Complaint (ECF 11), Franklin identifies both "Sherry Tiger" (*id.* at 4) and "Sherry Taylor" (*id.* at 5) as a Human Resources Specialist.

[(the "suitor")] doesn't want Shannon." *Id.* at 8.  Franklin alleges that "the actions of Ms. Tiger contributed to the harassment towards the Plaintiff." *Id.*

Franklin alleges that on February 21, 2014, Dryden asked Taylor "to so [sic] something because Mrs. Webster suspected the Plaintiff might contact Mrs. Alexander's spouse." *Id.* at 6. Franklin contends that, later that day, she heard Webster "say[] she wished she had some pretty Black girlfriends to send over to the Plaintiff's suitor's office." *Id.* at 6-7.

Franklin asserts, *id.* at 4: "On February 21, 2014, the Plaintiff called Sgt. [Wade] Alexander from her personal cell phone at 11:46 AM."  Sergeant Alexander is the husband of Shannon Alexander and apparently an officer with the Delmar Police Department.  *See id.* at 8. According to Franklin, at some point that afternoon Ms. Alexander told her: "If you contact my husband, I am going to be PISSED." *Id.* at 7 (capitalization in original).  Plaintiff submits that Ms. Alexander's statement "was a direct threat" "towards the Plaintiff and a violation of Defendant[']s Discrimination, Harassment and Retaliation Policy . . . ." *Id.* (citing ECF 8-8 at 2).

Franklin maintains, *id.* at 4: "Mr. Alexander made two attempts to return the Plaintiff's call on the Plaintiff's company cell phone [during] the evening of February 21, 2014, once around 5:19 PM and again after 5:30 PM. The Plaintiff spoke with Mr. Alexander sometime after 5:30 PM, while at the Plaintiff's home . . . ."  From Franklin's submissions, the substance of her alleged conversation with Sergeant Alexander is unclear.  But, the Maryland Department of Labor, Licensing and Regulation ("DLLR") issued its Unemployment Insurance Appeals Decision ("Appeals Decision") on May 6, 2014, which states that Franklin "contacted [a] co-

worker's husband to advise of her belief" that "a co-worker was making unwanted advances toward [her] suitor." ECF 8-1 at 2.

Franklin avers, ECF 8 at 5: "On Monday, February 24, 2014 before 8:00AM, Sgt. Alexander came to his wife's place of employment with the audio [recording] of his and the Plaintiff's conversation that took place on the evening of Friday, February 21, 2014. Sgt. Alexander met with Sherry Taylor, Pat Tiger, Rebecca Webster and Shannon Alexander." The Delmar Police Department appears to have recorded the call between Sergeant Alexander and Franklin during the normal course of business. *See id.* at 8. Franklin contends that she arrived for work "at 8:00 AM and was fired by 8:30 AM . . . ." *Id.* at 5.

In a letter dated February 24, 2014, Tiger informed Franklin of her immediate termination. ECF 8-12 at 1. Tiger wrote, *id.*: "Your employment with this agency has been terminated effective immediately for inappropriate behavior and misuse of agency equipment, stemming from your telephone contact with the spouse of another employee at his place of employment on Friday, February 21, 2014."

Franklin submits, ECF 8 at 9-10: "The Defendant['s] reason for terminating the Plaintiff is pretextual. The Plaintiff was fired in retaliation for contacting a coworker[']s spouse stemming from promiscuous behavior and unwanted advances towards the Plaintiff's suitor that the Defendant had knowledge of and actively participated in." Franklin contends, *id.* at 10: "All of the individuals directly involved in the harassment and wrongful termination of the Plaintiff are White women between the ages 35 to 65." Further, she asserts that Webster directly supervised her own sister-in-law in violation of TCC policy, but, unlike other TCC employees, Webster was not terminated for violating TCC's policy against "relationships with direct reports

. . . ."[9]  *Id.* at 6-7.  According to Franklin, ECF 11 at 3: "[P]laintiff[']s Unemployment Benefits were denied by the defendant to impose further harm to the plaintiff post termination."

In addition, Franklin maintains that on April 17, 2014, the DLLR conducted an administrative hearing to determine the status of her request for unemployment insurance benefits.[10]  *See* ECF 8 at 9.  Tiger and Sergeant Alexander offered testimony at the hearing.  ECF 8-1 at 1.  According to Franklin, during the hearing "Ms. Tiger offered and played a recording of the conversation [between Franklin and Sergeant Alexander] from her company cell phone, a recording that had clearly been altered."  ECF 8 at 4.  In the DLLR's Appeals Decision of May 6, 2014, the DLLR concluded that "the claimant was discharged, but not for misconduct connected with the work within the meaning of Maryland Code Annotated, Labor and Employment Article, §-1003.  No disqualification is imposed based upon this separation from employment with [defendant]."  ECF 8-1 at 3.  In particular, the DLLR found that TCC had failed to demonstrate that Franklin's alleged use of the company cell phone violated TCC policy.  *See id.*

On some unspecified date, Franklin filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").  ECF 1-1 at 1.  On December 18, 2014, the EEOC issued a "Dismissal and Notice of Rights," which notified Franklin that "the EEOC is unable to conclude that the information obtained establishes violations of the statutes" and that a lawsuit must be

---

[9]  The excerpts from TCC's written policies that Franklin submitted with her First Opposition (ECF 8) state that TCC "strongly discourages," but does not forbid, "romantic or sexual relationships between a supervisory employee and an employee who reports directly or indirectly to him or her . . . ."  ECF 8-8 at 3.

[10] Defendant states, ECF 12-1 at 7, Memo (bold in original): "On March 5, 2014, Plaintiff filed for Unemployment Insurance benefits. An appeal hearing was held on May 6, 2014, and a copy of that recorded hearing is attached hereto (on a CD) as **Exhibit E**."

filed within ninety days of the receipt of the notice. *Id.* As noted, Franklin filed this suit on March 18, 2015. ECF 1, Complaint.

TCC has moved to dismiss the First Amended Complaint (ECF 11), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief may be granted. ECF 12 at 1, Motion. In particular, TCC maintains, ECF 12-1 at 12-13, Memo:

> Plaintiff's Amended Complaint completely fails to state a claim under the threshold requirements for violation of Title VII of the Civil Rights Act of 1964 . . . retaliation and/or unlawful termination under Maryland law, and/or intentional infliction of emotional distress . . . . The allegations of the Amended Complaint are so bereft of factual content that the Court cannot draw any inferences, let alone a reasonable one, that Defendant intentionally discriminated against, retaliated against, unlawfully terminated, and/or intentionally inflicted emotional distress on Plaintiff. By failing to identify with specificity any incidents that allegedly constitute intentional discrimination, retaliation, unlawful termination, and/or IIED based on Plaintiff's case, the Amended Complaint offers no more than "unadorned, the-defendant-unlawfully-harmed-me" allegations that fall far short of the *Iqbal* standard. [*Ashcroft v.*] *Iqbal*, [556 U.S. 662, 678 (2009)].

Alternatively, TCC seeks summary judgment under Rule 56. It argues that that there are no material facts in dispute and therefore it is entitled to summary judgment.[11] *See* ECF 12-1 at 8-10, Memo.

## II. Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion

---

[11] TCC also argues that "Plaintiff's Amended Complaint is not in compliance with Local Rule 103(6)(c) . . . ." ECF 12-1 at 10, Memo. Local Rule 103(6)(c) provides: "Unless otherwise ordered by the Court, the party filing an amended pleading shall file and serve (1) a clean copy of the amended pleading and (2) a copy of the amended pleading in which stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type."

by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).  But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Therefore, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  *Twombly*, 550 U.S. at 555. Moreover, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). Put another way, in reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, ____ U.S. ____, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville,* 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 992 (2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ____ U.S. ____, 132 S. Ct. 1960 (2012).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards*, 178 F.3d at 243 (quotation marks omitted); *see Houck*, 791 F. 3d at 484; *Tobey v. James*, 706 F.3d 379, 387 (4th Cir. 2013). But, "if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint,'" or in other material that is the proper subject of consideration under Rule 12(b)(6), such a defense can be resolved on the basis of the facts alleged in the complaint.

*Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*); *see Houck*, 791 F.3d at 484.

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings . . . ." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013) (*abrogated on other grounds* by *Reed v. Town of Gilbert, Ariz.*, ____ U.S. ____, 135 S. Ct. 2218 (2015), as recognized in *Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015)). Under certain limited exceptions, however, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

Of relevance here, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'" *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).[12]   To be

---

[12] In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see* Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied,*____ U.S. ____, 132 S. Ct. 115 (2011);

"integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).   On this basis, I have considered the exhibits that plaintiff incorporated into her First Amended Complaint.  *See* note 4, *supra*.

As noted, defendant's motion is styled as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56.   A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Under Rule 12(d), if the court considers "matters outside the pleadings" then "the motion must be treated as one for summary judgment under Rule 56."  And, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[13]

---

*Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). And, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *cf. Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute"). However, "these facts [must be] construed in the light most favorable" to the non-movant. *Clatterbuck*, 708 F.3d at 557.

[13] A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion [to one for summary judgment], or to reject it or simply not consider it." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366, at 159 (3d ed. 2004 & Supp. 2015). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Rule 56(a) provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *Kolon Indus.*, 637 F.3d at 448-49.

In my view, it would be premature to construe the Motion under Rule 56. In regard to the matter of prematurity, the Fourth Circuit has said: "In general, summary judgment should only be granted 'after adequate time for discovery.'" *McCray v. Maryland Dept. of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In *McCray*, the Fourth Circuit determined, *inter alia,* that the district court abused its discretion in

---

district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials).

dismissing an action before the plaintiff had an opportunity to conduct discovery in connection with a Rule 56(d) motion. *Id.* at 483. The *McCray* Court noted, *id.*: "Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask."

Accordingly, I shall construe the Motion under Rule 12(b)(6).

### III. Discussion

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e—2(a)(1). *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F. Supp. 2d 314, 329 (D. Md. 2003).

The statute makes clear that the intentional discrimination must be on the basis of plaintiff's "race, color, religion, sex, or national origin." *See* 42 U.S.C. §§ 2000–e2(a)(1). And, in order to prevail under Title VII, "the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002); *see also Harris*, 510 U.S. at 21; *Hoyle,* 650 F.3d at 333–34.

In general, there are "two avenues" at trial by which a plaintiff may prove intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) as abrogated on other grounds by *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ____ U.S. ____, 133 S. Ct. 2517 (2013)).   The first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See*, *e.g.*, *Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act).

The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Although the precise formulation of the required prima facie showing

will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Under the *McDonnell Douglas* approach, if a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).   In *McDonnell Douglas,* the prima facie case of racial discrimination in hiring was formulated as follows, 411 U.S. at 802:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

If the defendant submits no evidence of any legitimate basis for its actions, the fact finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).  But, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.

If the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original)).  On the other hand, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the summary judgment or motion to dismiss stage, however, these approaches merely serve to inform a court's evaluation of the allegations. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*. . . .").

To survive a motion to dismiss, an employment discrimination complaint need not include specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas. Swierkiewicz v. Sorema*, *N.A.*, 534 U.S. 506, 508 (2002). Rather, "to survive a motion to dismiss, the complaint must 'state a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, ____ U.S.____, 132 S.Ct. 1327 (2012) (citation omitted).  Thus, if a defendant's contentions arise as arguments for summary judgment under Rule 56, the relevance of the prima facie case under *McDonnell Douglas* is also limited.

Indeed, the Fourth Circuit has admonished district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non.*'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). The Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non.*'" *Merritt,* 601 F.3d at 294-95 (citation omitted).[14]  Thus, "[b]y the time of appeal especially, the issue boils

---

[14] On several occasions where the employer proffered evidence in its motion for summary judgment of a legitimate reason for its adverse action, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case. *See*, *e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *cert. denied*, 546 U.S. 1091 (2006); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

down to whether the plaintiff has presented a triable question of intentional discrimination . . . ." *Id.* at 295.

As noted, Franklin alleges that she was wrongfully terminated, in violation of Title VII. ECF 11 ¶¶ 15-18, First Amended Complaint.  To state a claim for discrimination under Title VII, a plaintiff must allege: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190; *accord Gerner v. Cnty. of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012).

Franklin, who is African-American, is a member of a protected class.  She also alleges that she had satisfactory job performance.  *See* ECF 8 at 2; ECF 11 ¶ 4.  And, Franklin's termination was clearly an adverse employment action.  Thus, Franklin adequately alleges the first three elements for discrimination under Title VII.

Accepting "'as true all of the factual allegations contained in the complaint,'" and drawing "'all reasonable inferences in favor of the plaintiff,'" *Kolon Indus.,* 637 F.3d at 440 (citation omitted), as I must, Franklin also alleges adequately that she was treated differently from similarly situated non-African American employees.  Although Franklin's submissions are not a model of clarity, the crux of Franklin's allegations is that TCC terminated her for the "pretextual" (ECF 8 at 9) reason of "inappropriate behavior and misuse of agency equipment." ECF 8-12 at 1; *see also* ECF 8 at 9.  By contrast, Franklin submits, TCC retained two similarly situated "White" coworkers—Webster and Alexander—who allegedly engaged in inappropriate behavior, in violation of TCC's policies.  *See* ECF 8 at 5; ECF 8-12 at 1.

For example, the First Amended Complaint alleges that Webster and / or Alexander referred to Morris as "Buckwheat."  ECF 8 at 5.  Franklin also submits that both Webster and Alexander persisted in engaging with plaintiff's unnamed "suitor" through an office window.  *Id.* at 6.  Franklin also maintains that on February 21, 2014, Webster said that "she wished she had some pretty Black girlfriends to send over to the Plaintiff's suitor's office."  *Id.* at 6-7.  According to Franklin, when she complained to TCC's Human Resources Director, TCC took no disciplinary action against Webster and Alexander.  *Id.* at 7.

In addition, Franklin alleges that, during the afternoon of February 21, 2014, Ms. Alexander said: "If you contact my husband, I am going to be PISSED."  *Id.* at 7 (capitalization in original).  According to Franklin, Alexander's statement constituted "a direct threat" that violated TCC policy against workplace harassment.  *Id.*  Notwithstanding the alleged unprofessional conduct of Webster and Alexander, the two women were not terminated.  *See id.* at 9.[15]

Franklin acknowledges that her coworker's husband, Sergeant Alexander, twice called plaintiff on her TCC-issued cell phone.  ECF 8 at 4.  But, Franklin seems to contend that she did not violate TCC policy because she merely received those calls—she did not place them.  *See* ECF 14 at 2 ("The Plaintiff did not violate any company policies by giving out her company cell phone number or receiving a personal call on her company cell phone.").  And, in the DLLR's Appeals Decision, which plaintiff submitted as an exhibit, the DLLR concluded that TCC failed

---

[15] TCC asserts: "At no point during Plaintiff's employment did she complain of and/or report any of her co-workers for harassing and/or threatening her, nor did Plaintiff specifically complain of and/or report Mrs. Alexander for allegedly threatening her."  ECF 15 at 10-11, Reply.  In the context of the Motion, the Court must assume the truth of plaintiff's allegations.

to demonstrate that Franklin's alleged use of company equipment violated TCC policy.  ECF 8-1 at 3.[16]

In my view, Franklin's First Amended Complaint states a claim for wrongful termination under Title VII.  Put another way, Franklin has alleged facts sufficient to "nudge" her claim that TCC terminated her because of her race "from the conceivable to plausible . . . .'" *Twombly,* 550 U.S. at 570.

Franklin also alleges that she suffered "retaliation," in violation of Title VII.  ECF 11 ¶¶ 5-10.  In particular, she submits that on February 24, 2014, defendant's Human Resources Director, Patricia Tiger, "discharged the plaintiff in retaliation for calling a coworker[']s spouse from her personal cell phone and receiving two calls from the coworker[']s spouse on her company cell phone after business hours while at the plaintiff[']s residence."  *Id.* ¶ 6.

"To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove "'(1) that she engaged in a protected activity,' as well as '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405–06 (4th Cir. 2005)).  A protected activity constitutes conduct that "oppose[s] any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  The Fourth Circuit has said: "This Circuit, as well as the other Courts of Appeals, . . . has articulated an expansive view of what constitutes oppositional

---

[16] Franklin and TCC dispute how plaintiff used the company cell phone in her communication with Sergeant Alexander.  TCC contends, ECF 12-1 at 18, Memo: "When Plaintiff called Sergeant Alexander on the company issued cell phone and made her accusations against Mrs. Alexander, Plaintiff violated Defendant's Policies and Procedures."  However, this allegation is contested, and the Court cannot resolve any disputes of fact in the context of this Motion.

conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 259 (4th Cir. 1998)).

Franklin alleges that TCC retaliated against her for telephoning a colleague's spouse and using her company cell phone.  That conduct does not constitute a protected activity for purposes of alleging a retaliation claim pursuant to Title VII.  Accordingly, plaintiff's First Amended Complaint fails to state a claim for retaliation under Title VII.

In addition, Franklin contends that she suffered "[h]arassment."  ECF 11 at ¶¶ 15-18.  As noted, I have construed this assertion as a claim for hostile work environment.  Nevertheless, it is difficult to discern the factual basis for Franklin's hostile work environment claim.

Franklin seems to contend that Tiger failed to respond appropriately to Franklin's complaints about the behavior of Alexander and Webster toward Franklin's "suitor," which created a hostile work environment.  As clarified in her Opposition, Franklin asserts, ECF 14 at 3: "The HR Director aided in creating a work environment that a reasonable person would find hostile or abusive. The HR Director and HR Specialist did not take prompt remedial action to investigate and eliminate harassing conduct towards the Plaintiff. The HR Director failed to comply with the companies [sic] anti-harassment policy."  *See also* ECF 11 at 4-5 ("It is further alleged that the acts of the defendant's Human Resource Director, Patricia Tiger, as herein before, were made in her capacity as managing agent of defendant . . . and/or were acts that were ratified by defendant . . . .").

To state a Title VII claim that a workplace is racially hostile, a plaintiff must allege "'that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.,* 648 F.3d 216, 220 (4th Cir. 2011)).

Even assuming that the First Amended Complaint adequately alleges that Franklin suffered unwelcome conduct that was based on her race and that such conduct is imputable to TCC, plaintiff fails to allege that the conduct was sufficiently severe or pervasive so as to alter Franklin's conditions of employment.  With regard to the third element, the Fourth Circuit has said, *Boyer-Liberto*, 786 F.3d at 277-78:

> Element three of a hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"; the plaintiff may, but is not required to, establish that the environment is "psychologically injurious." *See Harris* 510 U.S. at 22, 114 S.Ct. 367. Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). That determination is made "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. It "is not, and by its nature cannot be, a mathematically precise test." *Id.* at 22, 114 S.Ct. 367.

> To be sure, viable hostile work environment claims often involve repeated conduct. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–17, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). That is because, "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115, 122 S.Ct. 2061. For example, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (alteration in original) (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399). The same goes for "simple teasing [and] offhand comments." *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d

662 (1998). Importantly, however, an "isolated incident[ ]" of harassment can "amount to discriminatory changes in the terms and conditions of employment," if that incident is "extremely serious." *Id.* (internal quotation marks omitted).

> In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Rodgers v. W.–S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993). Simply put, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Here, Franklin alleges simply that Tiger failed to respond adequately to her complaint against Alexander and Webster for inappropriate behavior toward Franklin's "suitor." Even assuming that Tiger failed to respond appropriately to Franklin's complaint, Franklin alleges only an isolated incident that is not extremely serious. Accordingly, plaintiff's First Amended Complaint fails to state a claim for a hostile work environment under Title VII.

Finally, plaintiff brings a claim for IIED under Maryland law. ECF 11 ¶¶ 19-22. In particular, she alleges, *id.* ¶ 22: "Defendants'[17] acts . . . were committed maliciously, fraudulently or oppressively with the intent of terminating plaintiff in retaliation, and/or with willful and conscious disregard of plaintiff's right to work in and [sic] environment free from intimidation and harassment." Further, Franklin contends that TCC acted "deliberately and intentionally" and with "reckless disregard . . . ." *Id.* ¶ 20. And, she maintains that TCC has caused her "to suffer extreme and severe emotional distress." *Id.* ¶ 21.

Claims for IIED are disfavored and difficult to establish and, as such, are "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.,* 770 F. Supp. 2d 751, 757 (D. Md. 2011).

---

[17] Franklin's First Amended Complaint refers repeatedly to "defendants," who were allegedly "the agents, servants and employees of" TCC, "acting within the scope of said agency and employment." ECF 11 ¶ 3; *see also id.* ¶ 1. TCC is, however, the sole named defendant in the First Amended Complaint. ECF 11 at 1.

In order to prevail on a claim for IIED in Maryland, plaintiffs must show that (1) the defendants' conduct was intentional or reckless; (2) their conduct was extreme and outrageous; (3) there was a causal connection between the defendants' wrongful conduct and the emotional distress suffered; and (4) the emotional distress was severe. *Harris v. Jones,* 281 Md. 560, 566 380 A.2d 611, 614 (1977); *accord, e.g., Manikhi v. Mass Transit Admin.,* 360 Md. 333, 758 A.2d 95, 112, 113 (2000); *Mixter v. Farmer,* 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann,* 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

The "extreme and outrageous" standard is quite high.  *See generally Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of intentional infliction of emotional distress is "rigorous, and difficult to satisfy"), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996). The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham v. Mayor & City Council of Baltimore,* 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris,* 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas,* 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md. App. 46, 59–60, 502 A.2d 1057, 1064, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986)), *aff'd,* 166 F.3d 1208 (4th Cir. 1998).

"As inappropriate and repulsive as workplace harassment is, such execrable behavior almost never rises to the level of outrageousness, and almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim

- 26 -

of intentional infliction of emotional distress under Maryland law." *Arbabi v. Fred Meyers, Inc.,* 205 F. Supp. 2d 462, 466 (D. Md. 2002) (dismissing IIED claim where plaintiff alleged she "was continually subjected to derogatory remarks based upon her sex as a female, her religion as a Muslim, and her national origin as an Iranian"); *accord, e.g., Wimbush v. Kaiser Found. Health Plan of the Mid Atl. States, Inc.,* TDC–14–00525, 2015 WL 2090654, at *9 (D. Md. May 4, 2015) (dismissing IIED claim where plaintiff alleged employer denied her FMLA leave, ignored "other requests for time off, gave better shifts, more clerical assistance, and more feedback to white employees, shut the door on [plaintiff], took personal credit for [plaintiff's] work, and eventually fired her"); *Murphy v. Republic Nat. Distrib. Co., LLC.,* JFM–13–02758, 2014 WL 4406880, at *7 (D. Md. Sept. 5, 2014) (dismissing IIED claim where plaintiff alleged he was "routinely subjected to derogatory comments about his age"); *Lauture v. St. Agnes Hosp.,* CCB–08–00943, 2009 WL 5166253, at *12 (D. Md. Dec. 29, 2009) (dismissing IIED claim based on employer directing security to escort employee out of the building), *aff'd,* 429 F. App'x 300 (4th Cir. 2011).

Construing the First Amended Complaint liberally, it alleges no facts to support Franklin's conclusory allegations as to an IIED claim. As noted, to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a plaintiff must allege more than bald accusations or mere speculation. *Twombly,* 550 U.S. at 555; *see Painter's Mill Grille,* 716 F.3d at 350. Moreover, a complaint that provides no more than "a formulaic recitation of the elements of a cause of action" is insufficient. *Twombly,* 550 U.S. at 555. Here, for example, plaintiff provides no factual allegations to support her contention that TCC acted with "reckless disregard." ECF 11 ¶ 20. Plaintiff's submissions also do not advance any factual allegations that illuminate what

"extreme and severe emotional distress" (*id.* ¶ 21) she alleges that she has suffered because of TCC's conduct.   Accordingly, the First Amended Complaint fails to allege facts sufficient to state a claim for IIED under Maryland law.

### III. Conclusion

For the foregoing reasons, I will deny the Motion (ECF 12), construed as a motion to dismiss, with respect to plaintiff's claim for wrongful termination under Title VII and grant it in all other respects.   A separate Order follows, consistent with this Memorandum.

Date: February 4, 2016                                    _____/s/_____
                                                                         Ellen Lipton Hollander
                                                                         United States District Judge